FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

2009 APR 30  P 4: 07

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

**SOUTHERN APPALACHIAN
MOUNTAIN STEWARDS and
THE SIERRA CLUB,**

Plaintiffs,

v.                                        CIVIL ACTION NO. 2:09cv200

**COLONEL DIONYSIOS ANNINOS,
District Engineer, U.S. Army Corps of
Engineers, Norfolk District,
LIEUTENANT GENERAL ROBERT
L. VAN ANTWERP, Chief of Engineers
and Commander of the U.S. Army Corps
of Engineers, and
GLENDA OWENS, Acting Director and
Deputy Director, Office of Service Mining,**

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. This action is a facial and as-applied challenge to Nationwide Permit 21 (NWP 21), a

general permit reissued on March 9, 2007 and effective on March 19, 2007 (hereafter "the 2007

NWP 21") pursuant to § 404(e) of the Clean Water Act (CWA), 33 U.S.C. § 1344(e).  72 Fed.

Reg. 11092 (March 12, 2007).  The 2007 NWP 21 is administered in Virginia by the Norfolk

District office of the United States Army Corps of Engineers (the Corps).

2. This action is also a challenge to the NWP 21 authorization issued by the Corps on

August 7, 2007 to A&G Coal Corporation (A&G) for its Ison Rock Ridge Surface Mine in Wise

County near Appalachia, Virginia.  This mine would cover 1,291.64 acres and would dump

11.14 million cubic yards of rock and dirt into nine valley fills.  The mining operations, valley

fills, and twenty sediment control ponds would together destroy or damage 14,640 linear feet of streams.

3. Mining activities would also adversely affect two National Register-historic districts located within less than ½ mile of the mine site. This action challenges the failure of the Corps to comply with Section 106 of the National Historic Preservation Act (NHPA) prior to issuing permits and approvals sought by A&G in connection with their mining activities, and the failure of the Office of Surface Mining (OSM) to comply with the NHPA before approving and supervising actions taken and permits issued by the Commonwealth of Virginia under the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. § 1201 *et seq.*

4. In issuing the 2007 NWP 21 and authorizations thereunder, the Corps has violated both the requirements of § 404(e) of the CWA, 33 U.S.C. § 1344(e), and its implementing 404(b)(1) Guidelines, 40 C.F.R. Part 230. It has also violated the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and acted arbitrarily and capriciously in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 *et seq.*

5. Plaintiffs ask the Court to (1) declare that Defendants have violated the statutory and regulatory duties described in this Complaint, (2) vacate and remand NWP 21 to the Corps; (3) enjoin the Corps from authorizing, pursuant to the 2007 NWP 21, further disposal of mining rock and dirt into valley fills associated with surface coal mines or other discharges of mining waste into waters of the United States in Virginia, (4) order the Corps to withdraw or suspend the 2007 NWP 21 authorization for A&G's Ison Rock Ridge Surface Mine, (5) vacate OSM's approval of Virginia's state program under SMCRA, and (6) award to Plaintiffs their costs and expenses, including reasonable attorneys' and expert witness fees.

## PARTIES

6. Defendant Lieutenant General Robert L. Van Antwerp is the Chief of Engineers and Commander of the U.S. Army Corps of Engineers. He is charged with the supervision and management of all Corps decisions and actions, including the evaluation of Corps decisions and actions under NEPA and § 404 of the CWA, which are the subject of this lawsuit.

7. Defendant Colonel Dionysios Anninos is the District Engineer for the Norfolk District office of the U.S. Army Corps of Engineers in Norfolk, Virginia. The Norfolk District office is responsible for issuing permits for discharges of dredged and fill material into waters of the United States throughout Virginia under § 404 of the CWA.

8. Defendant Glenda Owens is the Acting Director of OSM. OSM is responsible for implementing and enforcing SMCRA, and is responsible for ensuring that all surface mining permits issued pursuant to SMCRA, including those issued by the states under delegated authority, comply with the NHPA, OSM's own regulations, and other applicable legal requirements.

9. Plaintiff The Sierra Club is a nonprofit corporation incorporated in California, with over 750,000 members nationwide, some of whom reside in Virginia and belong to its Virginia Chapter. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass the exploration, enjoyment and protection of surface waters in Virginia.

10. Plaintiff Southern Appalachian Mountain Stewards is a non-profit association

3

incorporated in Virginia, with its office in Big Stone Gap, Virginia. It is an organization of concerned community members in southwestern Virginia who are working to stop the destruction of their communities by surface coal mining, to improve the quality of life in their area, and to help rebuild sustainable communities.

11. Plaintiffs' members have suffered, and will suffer, injuries to their aesthetic, recreational, environmental and/or economic interests by Virginia's issuance of surface mining permits under SMCRA and the Corps' past and threatened future authorizations of stream filling and disturbances related to mining activities in Virginia pursuant to the 2007 NWP 21. These activities make drastic changes to the landscape, eliminate large sections of forests, fill miles of streams, and pollute downstream waters. Plaintiffs' members live, recreate, flyover, use, and/or enjoy the natural and human environment near these areas. Their use and enjoyment of these areas is reduced by these mining activities.

## JURISDICTION AND VENUE

12. This action arises under the CWA, 33 U.S.C. §§ 1251 *et seq.*, NEPA, 42 U.S.C. § 4331, *et seq.*, the NHPA, 16 U.S.C. § 470, *et seq.*, the APA, 5 U.S.C. §§ 701–706, and the All Writs Act, 28 U.S.C. § 1651(a). The Court has subject matter jurisdiction by virtue of 28 U.S.C. §§ 1331, 1361, 1551, 2201 and 2202 and 16 U.S.C. § 470w-4.

13. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(e) because Defendant Anninos resides in this District and the Corps' 2007 NWP 21 authorization for the A&G mine was issued in this District.

## STATUTORY AND REGULATORY BACKGROUND

14. Congress enacted the CWA in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal,

the CWA prohibits the discharge of any pollutant, including dredged spoil or other fill material,

into navigable waters unless authorized by a CWA permit. *Id.* § 1311(a).

15. Section 404 of the CWA authorizes the Secretary of the Army to issue permits, in

certain circumstances, allowing the discharge of dredged or fill material into waters of the

United States. *Id.* § 1344(a). The Secretary of the Army acts through the Chief of Engineers of

the Corps. *Id.* § 1344(d); 33 C.F.R. § 323.6(a).

16. The Corps is authorized to issue two types of permits under § 404: individual permits

and general permits. *Id.* § 1344(a)–(e).

17. The Corps issues individual permits under § 404(a) on a case-by-case basis. Id., §

1344(a). Such permits are issued after a review involving, among other things, site-specific

documentation and analysis, public notice and opportunity for a hearing, public interest review,

and formal determination. 33 C.F.R. §§ 322.3; Parts 323, 325.

18. In contrast to individual permits, the Corps may allow activities to go forward with

minimal Corps involvement by using "general" or nationwide permits (NWPs). NWPs may be

issued on a state, regional, or nationwide basis "for any category of activities involving

discharges of dredged or fill material if the [Corps] determines that the activities in such

category are similar in nature, will cause only minimal adverse environmental effects when

performed separately, and will have only minimal cumulative adverse effect on the

environment." 33 U.S.C. § 1344(e)(1). According to the Corps, NWPs are limited to "minor

activities that are usually not controversial and would result in little or no public or resource

agency comment if they were reviewed through the standard permit process." 67 Fed. Reg.

2020, 2022 (Jan. 15, 2002).

19. NWPs must comply with guidelines issued by the U.S. Environmental Protection Agency pursuant to § 404(b)(1) of the CWA. 33 U.S.C. § 1344(b)(1).

20. NEPA requires federal agencies to prepare an Environmental Impact Statement (EIS) on "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Corps may be required to prepare an EIS before it issues NWPs or individual § 404 permits, but does not prepare any NEPA documentation before it issues authorizations under NWPs. 33 C.F.R. §§ 325.2(a)(4), 330.1(e), 330.5(a)(3).

21. The NHPA contains congressional findings, among others, that the nation's historic resources should be preserved; that the preservation of this irreplaceable heritage is in the public interest; that encouragement of preserving our historic resources will improve the planning and execution of federal projects and will assist economic growth and development; and that it is necessary and appropriate for the federal government to accelerate its preservation programs and activities. 16 U.S.C. § 470(b).

22. Section 106 of the NHPA, 16 U.S.C. § 470f, prohibits federal agencies from engaging in any federal undertaking (or federally assisted, licensed or permitted undertaking) unless the agency first (1) takes into account the potential effects of the undertaking on historic properties; and (2) affords the Advisory Council a reasonable opportunity to comment on the undertaking. Section 106 of the NHPA states:

> The head of any Federal agency . . . having authority to license any undertaking shall, . . . prior to the issuance of any license . . . , take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f.

6

23. Section 110(d) of the National Historic Preservation Act, 16 U.S.C. § 470h-2(d), provides as follows:

> Consistent with the agency's missions and mandates, all Federal agencies shall carry out agency programs and projects (including those under which any Federal assistance is provided or any Federal license, permit, or other approval is required) in accordance with the purposes of this subchapter and, give consideration to programs and projects which will further the purposes of this subchapter.

24. The Advisory Council on Historic Preservation ("ACHP") is an independent federal agency responsible for the implementation and enforcement of the NHPA in its entirety. 16 U.S.C. §§ 470i, 470j, 470k, 470s. The ACHP is responsible for promulgating regulations implementing Section 106 of the NHPA. Id. § 470s. 1 These regulations are binding on all federal agencies, including OSM.

25. The NHPA and the Section 106 regulations define "undertaking" as follows:

> "Undertaking" means *a* project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including --
> (A) those carried out by or on behalf of the agency;
> (B) those carried out with Federal financial assistance;
> (C) those requiring a Federal permit, license, or approval; and
> (D) *those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.*

16 U.S.C. § 470w(7); *see* 36 C.F.R. § 800.16(y) (emphasis added).

26. OSM's approval of state programs for the regulation of surface mining (known as approval of "primacy") pursuant to Section 503(b) of SMCRA, 30 U.S.C. § 1253, is a federal undertaking that is subject to Section 106.

27. OSM's approval of revisions or amendments to state programs, as well as its approval of annual grants to states with primacy to fund state programs, *see* 30 U.S.C. § 1295 and 30 C.F.R. Part 735, are federal undertakings that are subject to Section 106.

28. OSM gave conditional approval to Virginia's regulatory program on or about 1981,

7

and has approved a number of amendments to the state regulatory program, including amendments in 2000, and has ongoing role in the supervision and oversight of state regulatory programs. 30 C.F.R. § 946.15; 30 U.S.C. § 1295-1296.

29. The Department of Mines, Minerals and Energy (DMME) is the regulatory authority in Virginia for all surface coal mining and reclamation operations. DMME issues mining permits pursuant to its authority delegated to the Commonwealth of Virginia by OSM under § 503(b) of SMCRA.

30. OSM's regulations require permit applications and state programs to provide for the identification of "[t]he nature of cultural, historic and archeological resources listed or eligible for listing on the National Register of Historic Places and known archeological sites within the proposed permit and adjacent areas" and also provide that "[t]he regulatory authority may require the applicant to identify and evaluate important historic and archeological resources that maybe eligible for listing on the National Register of Historic Places." 30 C.F.R. §§ 779.12, 780.31, 784.17.

31. On or about 1980, OSM entered into a Programmatic Agreement with the ACHP and the National Association of State Historic Preservation Officers, which requires, among other things, that OSM provide the ACHP with an opportunity to review all amendments to state regulatory programs under Section 503(b) of SMCRA, and also requires OSM to modify its permanent regulatory program (30 C.F.R. Chapter VII) to conform to the requirements of Section 106.

32. The first step in the Section 106 process is for an agency to determine whether the proposed action is an undertaking as defined in § 800.16(y) and, if so, "whether it is a type of activity that has the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a).

8

33. Section 106 next requires agencies, in consultation with the State Historic Preservation Officer (SHPO) and other consulting parties, to make a good faith effort to identify the historic properties that are within the undertaking's area of potential effects, identify any adverse effects on historic properties, and attempt to resolve adverse effects. *Id.* §§ 800.4, 800.5.

34. If adverse effects are identified, the Section 106 process can be completed only by the execution of a "Memorandum of Agreement" ("MOA") between the agency, the SHPO, and the ACHP, if participating on the consultation, or by seeking the formal comments of the ACHP. *Id.* §§ 800.6(b), 800.7.

## FACTS

35. The Corps issued NWP 21 for surface coal mining activities in 1982, 1984, 1986, 1991, 1996, 2002, and 2007. 47 Fed. Reg. 31794, 31833 (July 22, 1982); 49 Fed. Reg. 39478 (Oct. 5, 1984); 51 Fed. Reg. 41206 (Nov. 13, 1986); 56 Fed. Reg. 59110 (Nov. 22, 1991); 61 Fed. Reg. 65874 (Dec. 13, 1996); 67 Fed. Reg. 2020 (Jan. 15, 2002); 72 Fed. Reg. 11092 (March 12, 2007).

36. Plaintiff Sierra Club and other organizations submitted extensive public comments and supporting evidence concerning the proposed 2007 NWP 21. These comments included the following contentions:

a. The Corps has no reasoned basis or substantial evidence to support its determination that the individual or cumulative environmental impacts of the 2007 NWP 21 will be minimal. In making that determination, the Corps ignored its own Final Programmatic EIS on Mountaintop Mining/Valley Fills in Appalachia (MTM/VF EIS) concerning the massive filling of streams by surface coal mining operations in Appalachia.

b.      The available scientific evidence demonstrates that discharges of material into waters of the United States associated with coal mining authorized by the 2007 NWP 21 are causing cumulatively significant degradation of the environment in Appalachia, including stream degradation, water quality degradation, and decreased aquatic diversity.

c.      The Corps' cumulative impact analyses in its decision documents fail to consider past impacts of NWP 21 authorizations, fail to measure stream impacts properly, fail to cumulate impacts across all NWPs, and use an improperly narrow scope of analysis.

d.      The Corps' reliance on compensatory mitigation to offset the effects of burying streams with mining waste is irrational, has no scientific basis, and is inconsistent with the Corps' own policy statements. The Corps does not explain or support its conclusion that compensatory mitigation is effective in achieving minimal impacts.

e.      The Corps' reliance on post-issuance procedures to determine minimal impacts violates § 404(e) of the CWA.

f.      The Corps' limitation of its scope of analysis to the "aquatic environment" violates 404(e) of the CWA and NEPA.

g.      The Corps' failure to include any limits on the amount of stream filled under the 2007 NWP 21 is irrational.

h.      The Corps' determination that the 2007 NWP 21 does not require preparation of an EIS under NEPA is irrational.

37. When it issued the 2007 NWP 21, the Corps relied on a Decision Document as the

basis for its compliance with NEPA and the 404(b)(1) Guidelines, including its determination

that NWP 21 results in minimal adverse effects.  72 Fed. Reg. at 11093, 11094.  In issuing the

final NWP 21 and Decision Document, the Corps did not adequately respond to, or account for,

the evidence cited in  public comments that NWP 21 will have more than minimal adverse

environmental effects.

38.  The 2007 NWP 21 anticipates that, upon notification by permit applicants, the

Corps' district engineers will conduct a "site-specific" review of the "extensive documentation"

included in Pre-Construction Notification (PCN) for fill activities and issue a written

authorization before the activity can proceed.  72 Fed. Reg. at 11114.  The Corps "believe[s] our

process" ensures minimal impacts "because each project is reviewed on a case-by-case basis and

the district engineer either makes a minimal impacts determination on the project or asserts

discretionary authority and requires an individual permit."  Id. at 11116.  The purpose of the

PCN process is to "focus [the Corps'] limited resources on activities that have the potential to

have more than minimal adverse effects on the aquatic environment."  Id. at 11098.

39.  The Corps acknowledged that the public only has an opportunity to comment at the

NWP issuance stage, not the authorization stage.  72 Fed. Reg. at 11116-17.  "There are no

requirements for public comments on specific projects authorized under the NWPs."  Id. at

11117.  The Corps suggested at one point that the public can comment adequately on NWPs

during the review process on SMCRA mining permits, but later admitted that "the current

SMCRA process does not adequately address impacts to the aquatic environment as required

under Section 404 of the Clean Water Act."  Id. at 11117.

40.  By not adequately responding to public comments at the NWP issuance stage, and by

deferring site-specific determinations of minimal effects to the NWP authorization stage when

the public has no right to comment, the Corps has effectively shut the public out of any review of its determination of minimal effects.

41. The Corps relies on compensatory mitigation plans as an "important mechanism" to try to achieve minimal impacts. 72 Fed. Reg. at 11100. "[W]e believe that the Corps can rely on mitigation in making a minimal adverse environmental effects determination." Id. at 11116. However, the Corps recognized that the "ecological success of compensatory mitigation projects varies widely," and sometimes fails. Id. As the Corps acknowledged, "a Corps official stated [in trial testimony] that he did not know of a single instance of successful headwater stream creation." Id. at 11115. Yet the Corps' only response to this concern was to state that "the Corps will add permit conditions that require compensatory mitigation that meets specified success criteria." Id. at 11115. The Corps completely deferred any analysis of compensatory mitigation success criteria and projects to the authorization stage, saying that "[d]istrict engineers have the flexibility to determine when compensatory mitigation should be required for activities authorized by NWPs." Id. at 11117. That analysis is performed by district engineers "on a case-by-case basis." Id. at 11164.

42. By not proposing any specific compensatory mitigation plans at the NWP issuance stage, and by deferring all analysis of such plans until the NWP authorization stage when the public has no right to comment, the Corps has effectively shut the public out of any review of its determination of the adequacy and effectiveness of compensatory mitigation to try to achieve a minimal effects level.

43. The Corps has provided no reasoned explanation or substantial evidence as to how compensatory mitigation will reduce the individual or cumulative effects of NWP 21 to a minimal effects level.

44. In considering the impacts of the 2007 NWP 21, the Corps limited its scope of analysis to impacts on the "aquatic" environment. Id. at 11114-15. Even though § 404(e) requires analysis of impacts "on the environment," the Corps did not consider other mining-related environmental impacts of the 2007 NWP 21, such as destruction of forests, riparian areas, and elimination of habitat for terrestrial wildlife. "The Corps evaluation of coal mining activities is focused on impacts to aquatic resources." Id. at 11115. Nevertheless, the Corps admitted that "riparian areas [i.e., terrestrial areas adjacent to streams] generally provide ecological functions that are important to the aquatic environment, and especially to the ecological integrity of streams." Id. at 11165. These important ecological functions include "moderating storm flows . . ., moderating water temperature changes, [and] . . . providing habitat for a wide variety of aquatic and terrestrial species." Id. As a result, the Corps made the contradictory decisions to include riparian areas within the scope of compensatory mitigation projects, but exclude them from its environmental impact analysis. Id.

45. The Corps issued the 2007 NWP 21 without preparing an EIS under NEPA. 72 Fed. Reg. at 11095. The Corps claimed that this NWP does "not reach the level of significance required for an EIS." Id.

46. At the time of its 2007 decision, a large amount of data cited in public comments and also contained in the Corps' MTM/VF EIS showed that activities covered by NWP 21 have had, and are likely to continue to have, more than minimal adverse environmental effects, both individually and cumulatively, as defined in 33 U.S.C. § 1344(e), and significant effects on the human environment, as defined in 42 U.S.C. § 4332(C). This data showed that mining and associated valley fills are causing unprecedented and major permanent impacts on aquatic and terrestrial ecosystems in Appalachia, including the elimination of hundreds of thousands of acres

of forests, the loss of habitat for wildlife, the burial and destruction of hundreds of miles of headwater streams, and the impairment of chemical and biological indicators in waters downstream from fills. The Corps failed to analyze, acknowledge, or refute this data.

47. In considering whether the cumulative effects of the 2007 NWP 21 are more than minimal, the Corps refused at the NWP-issuance stage to consider the effects of stream-filling activities under past NWP 21 permits. 72 Fed. Reg. at 11096. In contrast, the Corps has admitted in one of its decision documents at the NWP-authorization stage that "identification of the effects of past actions is critical to understanding the environmental condition of the area."

48. The Corps otherwise failed to support its 2007 decision to issue NWP 21 with substantial evidence or reasoned decision-making, and failed to respond adequately or meaningfully to public comments.

49. The Corps has used the 2007 NWP 21 to authorize filling of streams in Virginia, including the following authorizations:

| Date NWP 21 Authorized | Mining Co. | Mine | County | No. of Fills | Total Stream Impacts |
|---|---|---|---|---|---|
| 6/11/2007 | Clintwood Elkhorn | Bee Branch Surface | Buchanan | 1 | 6514 |
| 6/22/2007 | Paramount Coal Co. | Hawks Nest | Buchanan | 2 | 3225 |
| 6/26/2007 | Clintwood Elkhorn | Abners Fork Deep | Buchanan | 0 | 530 |
| 6/29/2007 | Twin Star Mining | Long Branch Blair Surface | Buchanan | 3 | 7590 |
| 7/2/2007 | Black Diamond | Huffman Fork Surface | Buchanan | 0 | 400 |
| 8/7/2007 | A&G Coal Corp. | Ison Rock Ridge Surface | Wise | 5 | 14640 |
| 10/10/2007 | Paramount Coal Co. | Rough Branch Surface | Buchanan | 1 | 11185 |
| 10/10/2007 | Clintwood Elkhorn | Abners Fork Surface | Buchanan | 1 | 5610 |
| 10/10/2007 | Black Diamond | Buckeye Surface | Buchanan | 5 | 9602 |
| 10/10/2007 | Paramount Coal Co. | Butcherknife Surface | Buchanan | 4 | 5690 |
| 10/11/2007 | A&G Coal Corp. | Possum Trot Surface | Wise | 4 | 6400 |

14

| 11/16/2007 | Nine Mile Spur LLC | No 7 | Wise | 1 | 5379 |
|---|---|---|---|---|---|
| 11/19/2007 | Nine Mile Spur LLC | No 5 | Wise | 2 | 6062 |
| 12/20/2007 | Paramount Coal Co. | Aily Deep | Russell | 0 | 760 |
| 4/30/2008 | Paramount Coal Co. | South Fork Surface | Wise | 1 | 2730 |
| 4/30/2008 | Paramount Coal Co. | Deep Mine 41 | Dickenson | 1 | 1230 |
| 5/12/2008 | Clintwood Elkhorn | Abners Fork Surface | Buchanan | 0 | 820 |
| 8/18/2008 | A&G Coal Corp. | Lick Branch Surface | Wise | 7 | 17190 |
| | | | **Totals** | **38** | **105557** |

50.  The Corps' 404(b)(1) Guidelines prohibit the "discharge of . . . fill material . . . if there is a practical alternative to the proposed discharge which would have less impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

51.  A&G's Preconstruction Notification for its Ison Rock Ridge Surface Mine contained no quantitative analysis about minimization of its nine valley fills, and merely made conclusory assertions that it had minimized fill impacts. The Corps uncritically accepted those assertions without requiring A&G to meet its burden of demonstrating that no practical alternatives were available to reduce fill impacts.

52.  The Corps did not adequately take into account the effects of mining activities on historic properties within the area of potential effects of the undertakings pursuant to Section 106 of the NHPA. These effects include extensive blasting associated with mountaintop removal mining operations, which can cause "physical destruction of or structural damage to all or part of the [historic] property," and thus constitute an adverse effect under the Section 106 regulations. 36 C.F.R. § 800.5(a)(2)(i). Moreover, the duration of blasting can last over a year, resulting in

15

extensive noise, as well as large quantities of dust and fumes, which introduce "visual, atmospheric, [and] audible elements that diminish the integrity of the property's significant historic features." *Id.* § 800.5(a)(2)(v).

53. On August 7, 2007, the Corps' Norfolk District office issued an NWP 21 authorization to A&G for its Ison Rock Ridge Surface Mine near Appalachia, Virginia. This mine would cover 1,291.64 acres and dump 11.14 million cubic yards of rock and dirt into nine valley fills. The mining operations, valley fills and twenty sediment control ponds would destroy or damage 14,640 linear feet of streams. The approved compensatory mitigation plan proposes to restore 10,790 linear feet of a stream outside of the permit area.

54. The Corps' minimal effects determination for A&G's NWP 21 authorization was issued without public notice and comment and did not address the criticisms raised by public comments on the 2007 NWP 21 permit. In addition, it failed to quantify relevant cumulative impacts, failed to adequately assess past impacts of development activities in the relevant watershed, and failed to quantitatively analyze available alternatives to minimize the impacts of the nine valley fills on streams.

55. The Corps issued the A&G NWP 21 authorization prior to the issuance of a surface coal mining permit from Virginia Department of Mines, Minerals, and Energy (DMME).

56. On April 3, 2009, the U.S. Environmental Protection Agency (EPA) sent a letter to the Corps requesting that it "use its discretionary authority provided by 33 C.F.R. 330.1(d) & 330.5(d) to revoke the previously verified Nationwide Permit 21" to A&G for its Ison Rock Ridge Surface Mine. EPA based this request on its belief that "additional avoidance and minimization efforts should be considered to reduce the adverse impacts of this proposal, that the anticipated impacts may cause or contribute to an impairment of downstream aquatic life use,

16

and that the direct and cumulative impacts from past, present, and future mines will be persistent and permanent and can not be sufficiently or effectively compensated through the proposed mitigation."

57. On information and belief, OSM did not consult with the relevant parties under the NHPA prior to approving Virginia's state program for the regulation of surface mining, approving amendments and/or funding to Virginia's program, and/or exercising ongoing supervision and control over this program.

## CLAIMS

## COUNT ONE

58. The Corps' issuance of the 2007 NWP 21 is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), and the CWA, 33 U.S.C. § 1344(e), for the following reasons:

a.      The Corps has no reasoned explanation, scientific basis, or substantial evidence to support its determination that the 2007 NWP 21 has minimal environmental effects, either individually or cumulatively, or to support its reliance on compensatory mitigation to ensure minimal impacts on stream functions;

b.      By not responding to public comments about its minimal effect determination at the issuance stage, and by deferring site-specific determinations of minimal effects to the authorization stage when the public has no right to comment, the Corps has violated its statutory duty to provide the public with the opportunity to review and comment on its determination of minimal effects;

c.      By not proposing any specific compensatory mitigation plans at the issuance stage, and by deferring all analysis of such plans until the authorization stage

17

when the public has no right to comment, the Corps has violated its statutory duty to provide the public with the opportunity to review and comment on the adequacy and effectiveness of compensatory mitigation to try to achieve a minimal effects level;

d.    In evaluating cumulative adverse environmental effects, the Corps failed to analyze those effects on the environment as a whole, and instead limited its scope of analysis to only the aquatic environment;

e.    In evaluating cumulative adverse environmental effects, the Corps failed to consider the effects of past activities authorized by NWP 21; and

f.    The Corps otherwise failed to support its 2007 decision to issue NWP 21 with substantial evidence or reasoned decision-making, and failed to respond adequately and meaningfully to public comments.

59. These violations of the Clean Water Act and the APA by the Corps threaten Plaintiffs with irreparable injury for which they have no adequate remedy at law.

**COUNT TWO**

60. The Corps' NWP 21 authorization to A&G for its Ison Rock Ridge Surface Mine is arbitrary and capricious in violation of the CWA and the APA because the Corps:

a.    had no reasoned analysis or scientific basis to support its conclusion that A&G's compensatory mitigation plan will offset all adverse effects of the mine on streams;

b.    failed to quantify relevant cumulative impacts;

c.    had no reasoned analysis or scientific basis to support its conclusion that the project will have minimal cumulative adverse environmental effects;

18

d.     failed to adequately assess past impacts of development activities in the relevant watershed; and

e.     failed to quantitatively analyze available alternatives to minimize the impacts of the nine valley fills on streams.

61. These violations of the CWA and the APA by the Corps threaten Plaintiffs with irreparable injury for which they have no adequate remedy at law.

### COUNT THREE

62. The Corps' finding that the 2007 NWP 21 will have no significant environmental impact is arbitrary, capricious, and contrary to law, in violation of the APA, 5 U.S.C. § 706(2)(A), because the issuance of that NWP is a major federal action that will significantly affect the quality of the human environment, and thus the Corps was required to perform an EIS pursuant to NEPA, 42 U.S.C. § 4332(C), before that NWP was issued.

63. These violations of NEPA and the APA by the Corps threaten Plaintiffs with irreparable injury for which they have no adequate remedy at law.

### COUNT FOUR

64. The Corps' issuance of the NWP 21 authorization to A&G is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), Section 106 of the NHPA, 16 U.S.C. § 470f, and implementing regulations, 36 C.F.R. Part 800, for the following reasons:

a.     The Corps failed to properly establish an area of potential effect of at least ½ mile from the permit area; and

b.     The Corps failed to properly assess adverse effects from blasting activities on historic properties within the area of potential effects of the undertaking, such as

19

the Derby and Appalachia Historic Districts.

c.   The Corps failed to properly engage in consultation with the ACHP and other consulting parties.

65. These violations of the NHPA and the APA by the Corps threaten Plaintiffs with irreparable injury for which they have no adequate remedy at law.

## COUNT FIVE

66. OSM has violated Sections 106 and 110(d) of the NHPA for the following reasons:

a.   OSM's delegation of authority to issue surface mining permits ("primacy") to the Commonwealth of Virginia, its approval of amendments and funding to Virginia's surface mining regulatory program, and its ongoing exercise of supervision and oversight of Virginia's surface mining regulatory program under SMCRA, are "undertakings" that have the potential to affect historic properties, and are therefore subject to Section 106;

b.   OSM failed to consult with the State Historic Preservation Officer and/or ACHP prior to delegating primacy to the Commonwealth of Virginia, or approving amendments and funding to Virginia's surface mining regulatory program, or in exercising supervision and oversight of Virginia's surface mining regulatory program, in violation of the ACHP's binding Section 106 regulations and procedures, 36 C.F.R. Part 800;

c.   OSM has failed to provide the ACHP an opportunity to review all amendments to state regulatory programs under Section 503(b) of SMCRA, and has failed to modify its permanent regulatory program (30 C.F.R. Chapter VII) to conform to the requirements of Section 106, in violation of the Programmatic Agreement

20

executed by OSM and ACHP; and

d.     OSM has failed to ensure that its permanent regulatory program for surface

mining and all projects authorized are carried out in accordance with the purposes

of the NHPA, in violation of Section 110(d) of the NHPA, 16 U.S.C. § 470h-2(d);

and

e.     OSM has failed to take into account the effects of A&G's pending surface mining

permit application, in violation of Section 106.

67. These violations of the NHPA and the APA by OSM threaten Plaintiffs with

irreparable injury for which they have no adequate remedy at law.

### PRAYER FOR RELIEF

Plaintiffs respectfully request this Court to grant the following relief:

1. Declare that the Corps' March 9, 2007 re-issuance of NWP 21 is contrary to § 404(e)

of the Clean Water Act, 33 U.S.C. § 1344(e), and its implementing regulations, and is arbitrary,

capricious, an abuse of discretion and otherwise not in accordance with law.

2. Declare that the Corps' finding of no significant impact and its failure to prepare an

EIS for the 2007 NWP 21 is arbitrary, capricious, an abuse of discretion, in violation of NEPA,

42 U.S.C. § 4332(2)(C), and otherwise not in accordance with law.

3. Declare that the Corps' issuance of the NWP 21 authorization to A&G for its Ison

Rock Ridge Surface Mine is arbitrary, capricious, an abuse of discretion and otherwise not in

accordance with law.

4. Declare that the Corps' issuance of the NWP 21 authorization to A&G is contrary to

Section 106 of the NHPA, 16 U.S.C. § 470f, and its implementing regulations, and is arbitrary,

capricious, an abuse of discretion and otherwise not in accordance with law.

5. Declare that OSM's delegation of primacy to Virginia under Section 502(b) of SMCRA and all subsequent approvals of Virginia's state regulatory program, violated Section 106 of the NHPA.

6. Vacate the 2007 NWP 21 and remand that permit to the Corps.

7. Vacate the NWP 21 authorization to A&G for its Ison Rock Ridge Surface Mine.

8. Enjoin the Corps from authorizing, pursuant to the 2007 NWP 21, further disposal of mining rock, dirt or coal refuse into valley fills associated with surface mining or other discharges of mining waste into waters of the United States, including such activities at A&G's Ison Rock Ridge Surface Mine.

9. Vacate OSM's approvals of Virginia's permanent state regulatory program.

10. Award Plaintiffs their costs and expenses, including reasonable attorneys' and expert witness' fees, as authorized by 28 U.S.C. § 2412(d)(2)(A) and 16 U.S.C. § 470w-4; and

11. Grant Plaintiffs such other and further relief as this Court deems appropriate.

Respectfully submitted,

WALTON MORRIS, Virginia State Bar No. 14438
Morris Law Office, P.C.
1901 Pheasant Lane
Charlottesville, Virginia 22901
Telephone (434) 293-6616
Fax (434) 293-2811
E-mail: wmorris@charlottesville.net